LOCKHART-BEMBERY VS. WAYLAND    CondenseIt™                    DEPO OF 

**Page 1**

```
              VOLUME:  I
              PAGES:   1 through 115
              EXHIBITS: See Index

              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

*****************************
YVETTE LOCKHART-BEMBERY,      )
                 Plaintiff,   )
     VS.                      )  C.A. NO.
                              )  04-10581-PBS
TOWN OF WAYLAND POLICE        )
DEPARTMENT, ROBERT IRVING,    )
in his capacity as CHIEF OF   )
THE WAYLAND POLICE DEPARTMENT )
and DANIEL SAURO,             )
                 Defendants.  )
*****************************

             DEPOSITION OF DANIEL SAURO,
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Kathleen M. McHugh, a
Registered Professional/Certified Shorthand
Reporter (#120093) and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Jason & Fischer, 47 Winter Street, Boston,
Massachusetts, on Tuesday, February 1, 2005,
commencing at 1:13 p.m.


                COPLEY COURT REPORTING
                  101 Tremont Street
                Boston, Massachusetts 02108
                     (617) 423-5841
```

**Page 2**

```
APPEARANCES:

JASON & FISCHER
  (By: Andrew M. Fischer, Esquire)
  47 Winter Street
  Boston, Massachusetts 02108
  Counsel for the Plaintiff

BRODY, HARDOON, PERKINS & KESTEN, LLP
  (By: Jeremy I. Silverfine, Esquire)
  One Exeter Plaza
  Boston, Massachusetts 02116
  Counsel for the Defendants
```

**Page 3**

```
                  I N D E X

Witness                           Direct
DANIEL SAURO
  (By Mr. Fischer)                  4


                  E X H I B I T S

Exhibit No.                                Page
   1    Incident Report, dated 2/6/02,
        consisting of two pages.             84
   2    Incident Narrative Report,
        dated 2/6/02.                        86
   3    Diagram.                             86
```

**Page 4**

1  PROCEEDINGS
2        MR. FISCHER: As far as stipu[lations]
3  can we agree to waive objections exc[ept]
4  until time of trial?
5        MR. SILVERFINE: Yes.
6        MR. FISCHER: Reserve motions to
7  strike until time of trial and I'd ask your
8  pleasure as to the witness reading and signing.
9        MR. SILVERFINE: You have a choice.
10 You can have an opportunity to read the
11 Stenographer's transcription, take it and read it,
12 or you can waive it and say it will be deemed
13 waived. You have an opportunity to look at it
14 and then --
15       THE WITNESS: I'd feel better reading
16 it first.
17       MR. SILVERFINE: Fine. Why don't we
18 read and sign and we'll waive notary.
19       DANIEL SAURO, having been
20 satisfactorily identified and duly sworn by the
21 Notary Public, testified as follows in answer to
22 direct interrogatories by Mr. Fischer:
23    Q. My name is Andrew Fischer.  I represent
24 Yvette Lockhart-Bembery in an action she's brought

**Page 5**

1  in which you're a party and in that capacity I'm
2  entitled to ask you questions which you're obliged
3  to answer under oath.
4           You understand this?
5     A. Yes.
6     Q. And you need to verbalize your
7  answers.  You can't say -- you can't shake or nod
8  your head and you can't say mm-hmm or mm-hmm
9  because they come out the same in the
10 Stenographer's transcript.
11    A. Understood.
12    Q. Okay.  From time to time I will do as
13 lawyers manage to do is make something confusing,
14 and if I ask a question that you don't understand,
15 I'm going to ask you to tell me your question is
16 confusing or I don't understand it, otherwise,
17 we're going to assume you understand the
18 question.
19    A. Yes.
20    Q. And, lastly, from time to time
21 Mr. Silverfine may say objection.  You're still
22 obliged to answer the question.  He's objecting so
23 that we can take before the judge whether the
24 question was appropriate at some later time.

**Page 6**

1      In fact, you need to answer every
2  question, even if Mr. Silverfine tells you not to
3  answer the question, although if he tells you not
4  to answer the question, your answer will be that
5  you're declining to answer the question upon the
6  advice of Mr. Silverfine.
7     A. Understood.
8     Q. You still need to say that on the
9  record.
10    A. Understood.
11       MR. FISCHER: Now, did we get an
12 identification?
13       THE STENOGRAPHER: Yes.
14       MR. FISCHER: I've never met Mr.
15 Silverfine.
16    A. I'll give you one of my cards, also.
17    Q. Can you tell us your name and address,
18 sir?
19    A. It's Daniel Sauro, S-a-u-r-o, and my
20 address -- you can contact me at any time at the
21 Wayland Police Department, 38 Cochituate Road,
22 Wayland, Mass., 01778.
23    Q. And in what town do you reside?
24    A. I'd rather not answer that for privacy

DEPO.OF: DANIEL SAURO    CondenseIt™  LOCKHART-BEMBERY VS. WAYLAND

Page 55

1  A. Correct. Just off the shoulder it's
2  all grass on either -- on both sides.
3  Q. And the roadways were clear of ice?
4  A. I can't say for sure. I can't say for
5  sure.
6  Q. I'm going to ask, could you sketch out
7  maybe down the middle of the paper --
8  A. Sure.
9  Q. Can you show us Route 30 and the two
10 lanes of travel, the shoulder and then where the
11 grass was?
12 A. Okay. To the best of my -- now, some
13 of this has changed. They've done a lot of
14 building and excavating and stuff over the years.
15 Q. I'm asking on the day of the incident.
16 A. Okay. To the best of my recollection,
17 to my terrible ability to write --
18 Q. I should warn you that I'm going to ask
19 you to put in Willowbrook Road or whatever it is.
20 A. Okay. If I put in Willowbrook, I can't
21 get to where the incident actually occurred, is
22 that okay, or do you want me to start back a bit?
23 Q. Why don't you start back a bit and take
24 another piece of paper if you need to?

Page 56

1  A. Okay. There's quite a stretch of road
2  there, sir, quite a stretch of road. To make it
3  easy I'll start back here (indicating). Okay.
4  This would be Rice Road. This is not to scale,
5  okay? Can you make that out okay?
6  Q. That's good.
7  A. This would be Route 30 both ways.
8  Q. Can you show us the -- can you --
9  A. Make, like, a line down the middle.
10 Q. Right.
11 A. Well, there was lines down the middle.
12 It's a no-passing zone --
13 Q. Okay.
14 A. -- like this (indicating).
15 Q. Do you want to continue 30 down so if I
16 ask you to put in --
17 A. Where the incident occurred?
18 Q. Where you saw the car.
19 A. Sure, come up somewhat like this
20 (indicating) and then -- let me see. That starts
21 a curve. You go uphill like this, something like
22 this (indicating). I'm definitely not a sketch
23 artist here. Okay.
24 Q. What are you writing here?

Page 57

1  A. Natick line.
2  Q. Okay.
3  A. Natick line is right about the end of
4  the straightaway.
5  Q. Why don't you put a dotted line to show
6  the --
7  A. Okay. That would be the Natick line
8  there (indicating).
9  Q. Can you show us the shoulder of the
10 road?
11 A. Let me see. The shoulder would be like
12 this (indicating). It's not very big.
13 Q. When you say it's not -- the shoulder
14 wasn't wide enough to contain a car without the
15 car being into the --
16 A. Into the travel lane.
17 Q. -- travel lane?
18 A. Correct, sir, yes, that's correct.
19 Okay.
20 Q. And what was beyond the shoulder in the
21 area where you saw -- where you saw the car in
22 response to this call?
23 A. Okay. On the shoulder was grass and a
24 driveway.

Page 58

1  Q. Grass, the lawn to a person's home, or
2  grass, wild grass?
3  A. Well, kind of -- well, it's funny. I
4  don't know where -- what was personal property,
5  but there was a driveway right near the car and
6  after the driveway there was grass on both sides
7  and a hill, okay, kind of a hill going down. The
8  driveway was also on a hill. So I don't know what
9  they owned, you know.
10 Q. So the garage at the end of the
11 driveway was lower than the level of the street?
12 A. Yeah. Definitely there was a real
13 downgrade for the driveway and also a downgrade
14 for the grass, a definite downgrade.
15 Q. Can you show us the driveway?
16 A. Okay. Let me cut the -- okay. I think
17 it went like this (indicating). This is all grass
18 and there is a downgrade. Okay. I'd say that
19 would be similar to the driveway. It was the
20 first driveway into Natick. It's about the only
21 one in that area. It's just a little, bitty house
22 and it's been rebuilt as a matter of fact. They
23 destroyed it all. It's been, like, done over, I
24 think, twice actually.

Page 59

1  Q. Okay.
2  A. So it's all the area that was once
3  there and set up is gone. It's completely
4  different.
5  Q. And the --
6  A. Do you want the vehicle as I first saw
7  it, sir? It would have been about --
8  MR. SILVERFINE: Why don't you wait
9  for his question.
10 Q. Show us the vehicle where you first saw
11 it and if you can draw it to show us where it was
12 in relation to the shoulder of the roadway and the
13 grass.
14 A. I'll do my best. Okay.
15 Q. So the car was halfway -- half of the
16 car was in the roadway and half of the car was on
17 the shoulder?
18 A. Well, I'll say probably three-quarters
19 of the car was in the roadway.
20 Q. Now, let me just go back and ask you.
21 You say there was a house there. Was this a
22 residential area or a more rural area?
23 MR. SILVERFINE: Objection as to
24 form. You can answer.

Page 60

1  A. By technical law I think it would be a
2  rural area because you have to have a dwelling
3  every so many hundred feet for a quarter of a mile
4  to be a thickly settled and I don't believe that
5  would pertain. So I think it would be legally a
6  rural area since there were no houses close by at
7  that time. There are now.
8  Q. I was asking more your sense as you
9  drove down the road. Did you see trees or houses?
10 A. Trees more than houses, sure.
11 Q. And how many -- you say this
12 Willowbrook was the entrance to that condominium
13 complex?
14 A. Yes, sir.
15 Q. From Willowbrook down to the driveway,
16 how far was it roughly? We won't hold you to
17 within ten feet.
18 A. Good quarter of a mile.
19 Q. Okay.
20 A. It was a good ways.
21 Q. And there weren't any houses between
22 there and this driveway?
23 A. Correct.
24 Q. So -- that's a bad question. From

Page 55 - Page 60    COPLEY COURT REPORTING (617) 423-5841

DEPO OF: DANIEL SAURO     CondenseIt™ LOCKHART-BEMBERY VS. WAYLAND

**Page 67**
1. See, this way, the people coming up the
2. straightaway had a line of sight of my lights, but
3. also the people coming down would have a line. If
4. I was further down, only people going further down
5. would see my lights. If I was further up, only
6. people coming down would see my lights. So I was
7. trying to think of safety.
8.    Q. And this marking on the road was the --
9. this marking you said -- there were marks next to
10. where you put the car, your pen marks?
11.    A. Oh, that was just grass. I recall that
12. was all grass right here (indicating) and that was
13. ice-covered grass. That I remember very
14. distinctly.
15.    Q. And what about near the Cadillac?
16.    A. It was grass up here (indicating),
17. too.
18.    Q. Okay.
19.    A. It was grass and it had, like, a little
20. curve, you know, going up.
21.    Q. And the grass sloped down from the
22. roadway --
23.    A. Yes, it did.
24.    Q. -- downhill?

**Page 68**
1.    A. Yes, sir.
2.    Q. So you got out of your vehicle and
3. walked to the Cadillac?
4.    A. Mm-hmm.
5.    Q. And the woman got out of the Cadillac?
6.    A. Eventually, yes.
7.    Q. And you observed her to be larger or
8. smaller than you?
9.    A. I think about the same height, but I
10. believe she might be a little heavier than I was.
11.    Q. And she told you that the car -- I'm
12. sorry. What did she tell you?
13.    A. She told me that the car was broken
14. down and that she had called AAA to tow it.
15.    Q. Okay. And what happened next?
16.    A. I called into the station and just
17. let them know it was in Natick, the DMV was in
18. Natick; that I would stand by and direct traffic;
19. that the lady had called AAA.
20.    Q. And did you receive any instructions?
21.    A. No.
22.    Q. And what did you do?
23.    A. I received only a confirmation they
24. received my radio transmission.

**Page 69**
1.    Q. And what did you do?
2.    A. I started directing traffic and it
3. started to get more backed up and I started to
4. get nervous that we were going to have another
5. accident there. So I went back to the lady.
6.    Q. You say another accident?
7.    A. Well, excuse me, have an accident
8. there, I'm sorry, have an accident there.
9.    Q. So there hadn't been an accident yet?
10.    A. No, not yet, but I've seen many
11. accidents on that curve. So I was getting worried
12. that there might be an accident because of the
13. vehicle, the way it was positioned, and I went
14. back to the lady and I said, would you like to try
15. rolling your car backwards. I said, you get into
16. the car, put it in neutral, put the key forward so
17. the steering wheel will turn, and slowly just, you
18. know, just using gravity, just let it roll back
19. and get it a little more off the road and maybe
20. you could even roll it into that driveway. But I
21. said, this is a suggestion, and I've made this
22. same suggestion to numerous people because we are
23. not allowed to physically push a car.
24.    Q. Now, do you know -- when you say "we,"

**Page 70**
1. you mean police officers?
2.    A. Well, police. In our department there
3. is a chief's directive that we do not push motor
4. vehicles by hand. I've been injured twice myself,
5. hurt my back twice, pushing cars.
6.    Q. Now, how could -- so you disobeyed the
7. directive?
8.    A. No. The directive is we do not push --
9. we, the police officer, never gets out and pushes
10. a car.
11.    Q. Okay. Now, you told me that you've
12. been injured twice pushing cars?
13.    A. Yes, prior to this directive, and
14. that's one of the reasons. Many other officers
15. have been hurt, also. That's why the directive
16. came out not to hand-push the car. We didn't want
17. men out on disability.
18.    Q. So it's a dangerous thing to push a
19. car?
20.    A. It can be.
21.    Q. And that's why police officers are
22. directed not to do so?
23.    A. We are.
24.    Q. I'm going to show you the copy of the

**Page 71**
1. rules and regulations that were provided to me by
2. your attorney and ask you if you can find me that
3. regulation.
4.    A. Okay. These are rules and
5. regulations. I'm talking about a directive from
6. the chief of police which I don't believe is in
7. here.
8.    Q. Would you agree to provide me with a
9. copy of that directive?
10.    A. I'd be glad to try to find it for you.
11.    Q. Maybe you want to talk to your lawyer
12. and just agree that --
13.    MR. FISCHER: Or maybe I can ask you,
14. Mr. Silverfine.
15.    MR. SILVERFINE: If you put it in
16. writing, I'll take a look at it.
17.    A. I'll be happy to.
18.    Q. So you weren't about to push this
19. vehicle because it wasn't safe to do so?
20.    MR. SILVERFINE: Objection as to
21. form.
22.    A. No. I was not going to touch the
23. vehicle.
24.    Q. Okay. But you suggested to the woman

**Page 72**
1. in the vehicle that she should move the vehicle
2. off the roadway?
3.    A. Roll it, drive it, roll it backwards,
4. from gravity, not pushing it; to have her get in
5. the car, put it in neutral, and gravity would just
6. let it roll back, which she did.
7.    Q. And she was in the car when she did
8. that?
9.    A. She certainly was.
10.    Q. And she did that because you told her
11. to do it?
12.    A. No. I suggested if she'd like to get
13. it off the road a little more, that she could do
14. that.
15.    Q. And what did she say?
16.    A. She was very cooperative and said sure,
17. I'll give it a try, or something like that. She
18. said sure. She got in and I stopped all the
19. traffic both ways and she started and she got in
20. the car and started rolling it back pretty good,
21. over towards the side of the road, towards this
22. driveway, and I think what happened is she wanted
23. to cut into the driveway but -- but kind of
24. overshot it a little bit probably because the

Page 67 - Page 72     COPLEY COURT REPORTING (617) 423-5841

LOCKHART-BEMBERY VS. WAYLAND    CondenseIt™                    DEPO OF: DANIEL SAURO

Page 109
1 would have decided to push her vehicle the way she
2 did?
3        MR. SILVERFINE: Objection as to
4 form. You can answer if you know.
5    A. No, not really, not after I told her to
6 stop it, you know, and just wait for the wreckers.
7    Q. And have you thought about why she did
8 this on her own?
9    A. Yes. I've given that some thought.
10 I've given some thought to that.
11    Q. Now, is it your testimony that she did
12 this on her own; am I correct?
13    A. Absolutely.
14    Q. And you say you've given it some
15 thought why she did it on her own?
16    A. Yes, I have.
17    Q. And why do you think she did this on
18 her own?
19        MR. SILVERFINE: Objection as to
20 form.
21    A. I think she might have thought that it
22 was imperative for whatever reason for her to get
23 the car off the road.
24    Q. Why do you think she might have thought

Page 110
1 that?
2        MR. SILVERFINE: Objection as to
3 form.
4    A. She could have -- you know,
5 communications can always be -- I've seen
6 in my job communications can at times be
7 misinterpreted, even though I was as plain
8 and straightforward as I could be that day. I
9 can't out rule the chance that she completely
10 misunderstood what I said.
11    Q. As you look back now, thinking about
12 this, do you think maybe she did -- she did
13 misunderstand what you said?
14        MR. SILVERFINE: Objection as to
15 form.
16    A. Not -- I don't think there's any way
17 she could misunderstand when I told her to stop
18 pushing the car and there's no way she could
19 misunderstand when I'm yelling at her, let it go,
20 let it go, let it go, repeatedly, as the car goes
21 down the hill and she goes running after it.
22 Those things I don't think she could possibly
23 misunderstand.
24    Q. So you don't think looking back on this

Page 111
1 that there was anything that you might have said
2 that caused her to think she should have done what
3 she did?
4        MR. SILVERFINE: Objection as to
5 form.
6    A. No, not the actions she took, no.
7    Q. And it's fair to say you don't think
8 that anything you did had anything to do with what
9 happened?
10        MR. SILVERFINE: Objection as to
11 form.
12    A. No, not the accident, no, sir, not at
13 all.
14    Q. Are you under any medication as you sit
15 here today?
16    A. No, sir.
17    Q. Do you take any medication regularly
18 for any physical or mental ailment?
19    A. No.
20    Q. Have you ever been arrested or
21 convicted of a crime?
22    A. No.
23    Q. In high school did you participate in
24 any athletics?

Page 112
1    A. Yes.
2    Q. What sports?
3    A. One mile indoor and cross country.
4    Q. So you were a runner?
5    A. Track.
6    Q. Track?
7    A. Mm-hmm.
8    Q. Do you participate in any sports on a
9 formal or informal basis now?
10    A. No.
11    Q. Have you in the last ten years?
12    A. No.
13    Q. You don't join Mr. Kesten's Sunday
14 pickup games?
15    A. I wish I did have time to play a
16 sport.
17    Q. Okay.
18        MR. FISCHER: I have no further
19 questions.
20        MR. SILVERFINE: Can I just get
21 copies of these?
22        MR. FISCHER: It's my practice to ask
23 the Stenographer to take them and affix them to
24 the deposition. I can make you copies, too.

Page 113
1 Off the record.
2        (Whereupon the deposition was
3 adjourned at 3:42 p.m.)

Page 114
                    CERTIFICATE

    I, DANIEL A. SAURO, do hereby certify
that I have read the foregoing transcript of my
testimony given on February __, 2005, and I further
certify that said transcript is a true and
accurate record of said testimony with the
exception of the following corrections listed
below):
Page    Line    Correction







Dated at _____, this _____ day
of _____, 2005.
                    MAURICE F. JOYCE
Signed under the pains and penalties of perjury.

DEPO OF: DANIEL SAURO　　　　　CondenseIt™　LOCKHART-BEMBERY VS. WAYLAND

Page 115

```
 1            CERTIFICATE
 2
 3   COMMONWEALTH OF MASSACHUSETTS
 4   SUFFOLK, SS.
 5        I, Kathleen M. McHugh, a Notary Public
 6   in and for the Commonwealth of Massachusetts,
 7   do hereby certify:
 8        That DANIEL A. SAURO, the witness whose
 9   testimony is hereinbefore set forth, was duly
10   sworn by me and that such testimony is a true and
11   accurate record of my stenotype notes taken in the
12   foregoing matter, to the best of my knowledge,
13   skill and ability.
14        IN WITNESS WHEREOF, I have hereunto
15   set my hand and Notarial Seal this 2nd day of
16   February, 2005.
17
18                    KATHLEEN M. MCHUGH
                      CRR/RPR/CSR #120093
19                    Notary Public
20   My Commission Expires: August 8, 2008
21
22   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
23   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
24   DIRECTION OF THE CERTIFYING REPORTER.
```

Page 115 - Page 115　　　　　　　　　COPLEY COURT REPORTING (617) 423-5841

Case 1:04-cv-10581-NMG    Document 25-2    Filed 08/08/2005    Page 6 of 6