

EXHIBIT
B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10581 NMG

YVETTE LOCKHART-BEMBERY,          )
                Plaintiff,        )
                                  )
        vs.                       )
                                  )
TOWN OF WAYLAND POLICE DEPARTMENT,)
ROBERT IRVING, in his capacity as )
CHIEF OF THE WAYLAND POLICE DEPARTMENT)
and DANIEL SAURO,                 )
                Defendants.       )

        DEPOSITION OF YVETTE LOCKHART-BEMBERY, taken
pursuant to Rule 30 of the Massachusetts Rules
of Civil Procedure, before Theresa M. Edwards,
Professional Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the
Law Offices of Brody, Hardoon, Perkins & Kesten,
One Exeter Plaza, Boston, Massachusetts, on
Monday, February 7, 2005, commencing at 11:35 A.M.

        DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
                One State Street
                Boston, MA 02109
                (617) 742-6900

APPEARANCES:

For the Plaintiff:

        LAW OFFICES OF JASON & FISCHER
        47 Winter Street
        Boston, MA 02109
        (617) 423-7904
        BY:  ANDREW M. FISCHER, ESQUIRE

For the Defendants:

        LAW OFFICES OF BRODY, HARDOON, PERKINS & KESTEN
        One Exeter Plaza
        Boston, MA 02116
        (617) 880-7100
        BY:  JEREMY SILVERFINE, ESQUIRE

Also Present:

        Robert Irving - Chief of Wayland Police Department
        Daniel Sauro - Wayland Police Department

                                                    3

                I N D E X

WITNESS: YVETTE LOCKHART-BEMBERY

                           Direct      Cross

By Mr. Silverfine             4
By Mr. Fischer               --

                E X H I B I T S

Exhibit No.                              Page

    1        Complaint                    64
    2        Diagram                     116
    3        Diagram                     122
    4        Photocopy of Photograph     141
    5        Photocopy of Photographs    143

                                                    4

                    STIPULATIONS

        It is hereby stipulated and agreed by and
between counsel for the respective parties that all
objections, except as to the form of the question,
and all motions to strike, are reserved until the
time of trial.

        It is further stipulated and agreed that the
witness will read and sign the transcript, waiving
notary, within 30 days.

        YVETTE LOCKHART-BEMBERY, the deponent, having
first been duly sworn, deposes and testifies as
follows:

                    DIRECT EXAMINATION

Q.  (By Mr. Silverfine)  Good morning.  My name is
    Jeremy Silverfine, and I represent the Town of
    Wayland Police Department and Daniel Sauro and
    Chief Robert Irving in his capacity as Chief of
    the Wayland Police Department in a civil action
    you have filed.  I'll be asking you a series of
    questions here today, and you're obligated to
    answer under oath to the best that you can.  Do
    you understand so far what I've said?
A.  Yes, I do.
Q.  There will be a stenographer, obviously, that

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.



69

1  Q.  What time was the class?
2  A.  Nine o'clock.
3  Q.  Nine o'clock?
4  A.  Yes.
5  Q.  What time did you leave your home that day?
6  A.  About eight.
7  Q.  In relation to where you eventually stopped,
8      how far is it from where you stopped to your
9      home?
10 A.  To my home?
11 Q.  Yes?
12 A.  You mean in miles?
13 Q.  Miles is fine?
14 A.  I don't know.  It's like 15 to 20 minutes.
15 Q.  The class that you were going to, had you
16     signed up in advance for it?
17 A.  Yes.
18 Q.  Did you pay any money for it?
19 A.  Yes, I did.
20 Q.  How much did you pay?
21 A.  Five hundred and something, almost $600.
22 Q.  Five hundred dollars?
23 A.  Almost $600.
24 Q.  What kind of certification were you going to

70

1      get?
2  A.  You have to keep getting recertified as a
3      nursing assistant.
4  Q.  You were going for your recertification or this
5      was the first time you were getting certified?
6  A.  No.  I was certified many different times.  But
7      every time you go to a different place, they
8      make you go to their certification.  So this
9      time, I wanted a certification I could travel
10     with, that went with me.
11 Q.  What was the address of the place in Waltham
12     that you were going to?
13 A.  I can't give you that.  It's the Red Cross in
14     Waltham.  There's only one place.
15 Q.  Do you remember who was instructing the class?
16 A.  No.  I can't remember that.
17 Q.  Do you remember the weather on that particular
18     morning?
19 A.  Yes.  It was very -- partly sunny, partly
20     cloudy.  It depends on your condition.  No
21     precipitation.  The roads were dry, except in
22     spots.  Does that answer that?
23 Q.  Was there snow on the ground, if you recall?
24 A.  Not on the road.

71

1  Q.  Not on the road?
2  A.  No.
3  Q.  The road surface was what?
4  A.  Dry.
5  Q.  Clear?
6  A.  Yes.
7  Q.  Did you have any problems with your vehicle up
8      until the time that it had stopped at the point
9      in time in which you allege your complaint?
10 A.  The lights went off on the dash, and I put my
11     foot on the gas to see if it was running.  It
12     was not.  So I looked up ahead to see where --
13     because I was on an incline at that point, I
14     looked up ahead to see where I could turn.  I
15     was very familiar with that area since I went
16     to Regis, which was a stone's throw from there.
17     I pulled over to a clearing on the shoulder of
18     the road.
19 Q.  Had you had problems with that vehicle before
20     February 6, 2002?
21 A.  No.
22 Q.  Up until that time --
23 A.  Nothing like that.
24 Q.  Had you had any problems with the car breaking

72

1      down at all --
2  A.  No.
3  Q.  -- prior to that date?
4  A.  No.
5  Q.  Had you had to call AAA for the car prior to
6      February 6, 2002?
7  A.  I needed a battery once, and I got a battery.
8      I got tires, brakes, things like that.  Just
9      general maintenance; nothing like that.
10 Q.  How were you dressed on the morning of
11     February 6, 2002?
12 A.  How was I dressed?  What exactly does that
13     mean?
14 Q.  What were you wearing?
15 A.  I had the bag at home, white jeans.
16 Q.  I'm sorry?
17 A.  I have the bag at home because they had cut
18     them off of me.  White jeans, we had to wear
19     white pants.  All I had was white jeans, which
20     I have a lot of.  A white top, a very -- my
21     favorite silver jacket, metallic jacket, with
22     the big hood, with black faux fur around the
23     front, around the outline of the hood.  I had
24     my big thing that I cover my hair with.

73

1  Q.  You said big thing you cover your hair --
2  A.  I wear drapings.
3  Q.  I'm sorry?
4  A.  I wear head gear, head drapings.
5  Q.  Is that similar to the draping you're wearing
6      today at the deposition?
7  A.  The one I had on was bigger.
8  Q.  Bigger?
9  A.  Yes. I don't wear them as big since 9/11.
10 Q.  Do you wear drapings everyday?
11 A.  Yes, I do.
12 Q.  Why do you wear drapings everyday?
13 A.  My religion.
14 Q.  What religion is that?
15 A.  Okay. That's kind of hard to answer. I was
16     born and raised Catholic, but I believe in all
17     religions. So I would have to say Quan Yin
18     Meditation Initiate.
19 Q.  I'm sorry. I'm not familiar. The reason
20     you're wearing --
21 A.  I just told you.
22 Q.  You have to forgive me.
23 A.  Quan Yin, Q-U-A-N, then a capital, Y-I-N,
24     Meditation Initiate.

74

1  Q.  Could you spell that for the stenographer?
2  A.  Initiate?
3          THE WITNESS:  Do you know how spell
4      "initiate"?
5      (Spelling confirmed.)
6  Q.  (By Mr. Silverfine):  You consider that a
7      religion?
8  A.  It's not really a religion. It's a way of
9      life.
10 Q.  Is there a temple that you belong to or some
11     similar church where you go?
12 A.  Yes, everywhere. There's one everywhere.
13 Q.  Is there one you regularly attend?
14 A.  In people's homes. The one I was initiated is
15     in Connecticut. I was going to say
16     Connecticut, but their home base is in Ohio.
17     But the closest one, it was in New York,
18     outside of New York, so Connecticut.
19 Q.  Do you regularly attend some local place where
20     you worship?
21 A.  We're obliged to maintain whatever faith we
22     chose while observing their stipulations to
23     maintain your initiation, which includes two
24     and a half hours to three hours to four hours

75

1      of meditation daily, a vegan diet, which means
2      no meat, eggs, poultry, whatever, anything with
3      a face -- any sentient being that has feelings
4      -- no alcohol, no adultery. I can't remember
5      what else there is. I don't do them anyway.
6      That's about it.
7  Q.  How long have you been participating in this?
8  A.  In this particular organization or how long
9      have I been --
10 Q.  Yes, in this particular organization?
11 A.  -- or how long have I been dressing this way?
12 Q.  The organization first?
13 A.  The organization was -- I was initiated in
14     2000. I started practicing two years prior to
15     that, so that would be 1998. I became aware of
16     the organization because I'm a Reiki master,
17     R-E-I-K-I.
18 Q.  What does that mean; what is a Reiki master?
19 A.  It's a hands-on healing technique that a lot of
20     therapists use.
21 Q.  How long have you been dressing in this
22     particular fashion as you've described?
23 A.  I would say 15 to 20 years.
24 Q.  Do you consider yourself Christian, as well?

76

1  A.  Yes. I believe in Jesus.
2  Q.  I notice today in the deposition you're wearing
3      a cross around your neck. Is that something
4      you regularly wear?
5  A.  I wear it all the time.
6  Q.  Were you wearing it on February 6, 2002?
7  A.  Not this particular one. My daughter gave this
8      to me. It's for a nurse with the clock in the
9      middle.
10 Q.  Were you wearing a cross on the outside --
11 A.  I had a cross, a gold cross.
12 Q.  -- on the outside of your clothing?
13 A.  On the day of the accident?
14 Q.  Yes?
15 A.  No. You couldn't have seen it anyway. I had a
16     big coat on. It was winter.
17 Q.  I'm just asking what you were wearing, and
18     today you have a --
19 A.  I had a cross on, a gold cross with a gold
20     chain, but it was underneath my clothing.
21 Q.  Do you consider yourself Muslim?
22 A.  No, I don't. But, I do believe in and respect
23     their beliefs.
24 Q.  On February 6, 2002, you said you were heading

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

**77**

```
 1      to the Red Cross in Waltham.  Did something
 2      happen along the way that caused you to stop?
 3   A.  My car stopped moving.
 4   Q.  Where, if you recall, did your car stop moving?
 5   A.  I had just passed a Natick sign, "Entering
 6      Natick."
 7   Q.  What did you do when your car stopped?
 8   A.  It didn't stop.  I said that I noticed that
 9      there were no lights on the dash.  I put my
10      foot on the gas.  I realized it was moving
11      because I was going downhill.  But, there was
12      no gas going to the engine.  It wasn't running,
13      basically.
14   Q.  So you say you noticed there were no lights on
15      the dash and you were going downhill.  How long
16      did you travel in this fashion for?
17   A.  Two minutes.
18   Q.  Then what happened?
19   A.  I pulled over as far as I could, which was out
20      of traffic completely.  I tried it again to see
21      if it would start because I thought it was a
22      fluke or something.  It would not start.  I
23      started searching for my cell phone, which I
24      couldn't find.
```

**78**

```
 1   Q.  Were you able to restart the car?
 2   A.  No, I wasn't.
 3   Q.  The car, you say, was on the side of the road
 4      facing which direction?
 5   A.  I was going on the proper side of the road, the
 6      right side of the road, off of the road.  There
 7      was like a cemented little path there where
 8      people pull off.  I have not been able to find
 9      it since then, but I know that it's there
10      because I used to see it when I was going to
11      Regis.  I got there.  I looked for my cell
12      phone.  Unable to locate it, I made the
13      assumption that I left it at home on the table.
14      So I decided to get out of the car and stand on
15      the side, on the passenger side.  Several
16      people stopped and offered use of their cell
17      phone to call AAA.  Everyone was very nice.
18   Q.  In fact, did you have AAA service, the card, a
19      member --
20   A.  Yes, of course I do.
21   Q.  Did you call AAA?
22   A.  Yes, I did.
23   Q.  Do you remember what time you called?
24   A.  No, I don't.  But, I'm sure they have a record
```

**79**

```
 1      of it.
 2   Q.  After you used the phone, did you stay outside
 3      or did you get back inside the car?
 4   A.  No.  I stayed outside.
 5   Q.  Do you remember what direction -- you said you
 6      pulled on the side of the road.  Do you
 7      remember what direction you were heading in?
 8   A.  Towards Waltham.
 9   Q.  You were on Route 30 at this point?
10   A.  Yes.
11   Q.  Heading towards Waltham away from Framingham?
12   A.  Yes.
13   Q.  What happened next?
14   A.  I was peacefully waiting for the arrival of
15      AAA.  They said they would put a priority on it
16      since I was on Route 30.  A woman drove up,
17      driving in the opposite direction, and asked if
18      I was okay.  I told her, yes, I was fine, that
19      AAA was on the way.  She informed me that she
20      had telephoned the police because she noticed I
21      was slumped -- she thought I was slumped in the
22      car and may have been hurt.
23   Q.  Let's stop you right there.  When you say
24      "slumped," you said you were outside the car,
```

**80**

```
 1      though?
 2   A.  I know, I wasn't.  I don't know when she saw
 3      me.
 4   Q.  Were you, at any point in time --
 5   A.  I was looking for my cell phone.
 6   Q.  The question is, at any point in time, were you
 7      slumped over the wheel of the car?
 8   A.  No.
 9   Q.  So this woman said to you --
10   A.  Made the assumption.
11   Q.  -- she thought you were slumped over the car?
12   A.  She said it appeared that I looked like I was
13      hurt, and she telephoned the police to tell
14      them.
15   Q.  What did you say, if you recall, at that point?
16   A.  I said, "No.  I'm perfectly fine.  I was
17      looking for my cell phone."  She said that she
18      would notify the police that I was fine.
19   Q.  What happened next?
20   A.  The next thing I know, the police showed up.
21   Q.  The police showed up.  Cruiser, marked cruiser,
22      unmarked cruiser?
23   A.  No.  It was a marked cruiser.
24   Q.  Marked cruiser.  Do you remember what
```

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

81

1 department it was?
2 A. It was Wayland Police. She told me that she
3 called Wayland Police.
4 Q. Who arrived from the Wayland Police?
5 A. I didn't know his name at the time, but it was
6 Sergeant Sauro.
7 Q. What did Sergeant Sauro do when he arrived?
8 A. He proceeded to look every place, but at me.
9 Q. Tell us exactly what he did?
10 A. He got out of his car, walked around my car.
11 Q. Are you on the inside of the car or the
12 outside?
13 A. I already told you that I was standing outside.
14 Q. I'm just trying to get your testimony as to
15 what happened --
16 A. I have not moved. I am standing outside.
17 Q. So you're outside. Where in relation to your
18 car are you standing?
19 A. I'm on the ground, dirt, not snow, not
20 anything. I'm on grassy dirt.
21 Q. You're standing on the passenger side of your
22 car?
23 A. Passenger side of my car.
24 Q. You say Officer --

82

1 A. Not exactly next to it.
2 Q. What does Officer Sauro do; describe for us --
3 A. While I was talking to him, explaining that I
4 had been looking for my phone, he immediately
5 just went over and ripped open my door.
6 Q. Which door?
7 A. Passenger side door.
8 Q. What did he do?
9 A. Proceeded to reach into the crevice and said,
10 "Here's your phone."
11 Q. What happened next?
12 A. He said, "Move the car. It's going to be
13 towed."
14 Q. What did you say?
15 A. I said, "How am I supposed to move the car if
16 it doesn't start?"
17 Q. What happened next?
18 A. He said, "You just won't have power steering.
19 The car can be moved."
20 Q. What did you say?
21 A. I didn't say anything because he immediately
22 went to his radio and started calling to have
23 it towed.
24 Q. Did you say anything else at that particular

83

1 point to the officer?
2 A. I don't recall saying anything else because he
3 had walked away from me and wasn't listening to
4 me anyway. That was my perception.
5 Q. I'm asking you, though, your best memory as to
6 what you said and what he said at that point?
7 A. I basically told you, to my recollection, what
8 he said.
9 Q. Anything else that you remember the
10 conversation between you and Officer Sauro at
11 that point?
12 A. I don't recall. There probably was more.
13 Q. I'm asking what your memory of the other
14 conversation was?
15 A. At this point, it's a little blurry as to what
16 he said because traumatic events occurred
17 during that point.
18 Q. I'm just asking your best memory as to what
19 else was said between you and Officer Sauro?
20 A. I told you what I can recall.
21 Q. At this point --
22 A. At this point, I can't recall more than that,
23 but I'm sure there was more.
24 Q. I'm asking you, and I think we're entitled to

84

1 know, if there is anything else you can recall
2 as to the conversation as you sit here today
3 between you and Officer Sauro?
4 A. Did I just answer that?
5     MR. FISCHER: I think she just
6     answered that.
7 Q. (By Mr. Silverfine): Is there anything
8 impeding your memory today as you sit here?
9 A. Like what?
10 Q. That's what I'm asking you. Is there anything
11 interfering with your memory today? Are you on
12 medication?
13 A. No, I'm not.
14 Q. Did you take any alcohol or drugs in the last
15 24 hours?
16 A. No. I just told you I don't drink.
17 Q. I am asking you, is there anything that would
18 interfere with your ability to remember any
19 further conversation between you and
20 Officer Sauro on February 6, 2002?
21 A. No chemically, medically anything. Maybe
22 traumatically, I am blanking on a lot of
23 things. But, no chemicals, medicine, anything
24 like that is preventing me from remembering.



109

1  A.  No, not to my knowledge anyway.
2  Q.  I'm going to ask you to draw a diagram of the
3      roadway where your vehicle stopped and which
4      you described for us earlier where you had the
5      interaction with Daniel Sauro, if you could
6      just draw the road.
7          MR. FISCHER:  We'll stipulate that
8          this is not to scale, and we're not
9          grading you on your art skills.
10         THE WITNESS:  They also changed the
11         whole road.
12 Q.  (By Mr. Silverfine):  We're just asking you to
13     draw, as best you can, your memory of the road
14     and where your car was in relation to the road
15     when it came to a stop.  If you could draw
16     Route 30 and if you could draw the road as best
17     you can, almost as if you were drawing a map.
18 A.  It's only that little bit.  This is the
19     shoulder, which I was not on.
20 Q.  If you could draw like as if you were drawing a
21     diagram looking down at a map, that would be
22     terrific.
23         MR. FISCHER:  Would it be helpful if
24         I showed her a defendant's drawing as an

110

1      example.
2          MR. SILVERFINE:  I think it would be
3          duly unsuggestive --
4          MR. FISCHER:  That's why I'm not
5          doing it.
6          THE WITNESS:  There was a street
7          there.
8      (off the record.)
9  Q.  (By Mr. Silverfine):  Are you drawing Route 30;
10     is that accurate?
11 A.  Yes.
12 Q.  If you could just put east and westbound?
13 A.  I don't know which is east.
14 Q.  Is it fair to say that if I suggested that east
15     was heading towards Boston --
16 A.  That's east?
17 Q.  Would that be helpful?
18 A.  Yes.  That would be helpful.  I'm terrible with
19     that.
20 Q.  If you could draw Route 30 where your car was,
21     put a little box, maybe a rectangle, where your
22     car came to a stop?
23 A.  I'm coming this way.
24 Q.  You're indicating on this piece of paper you're

111

1      heading eastbound, correct?
2  A.  I'm heading eastbound when the lights go out in
3      the car, and it's on downhill.  It's headed --
4      not really a hill, but it was moving without
5      any gas or acceleration when I realized that
6      there was no electricity, no power, whatever.
7      There was no traffic coming, no traffic in my
8      rear or forward.  I proceeded to just go over
9      here.
10 Q.  You're drawing a dotted line.  You put a
11     triangle --
12 A.  This is like shoulder, so I'm letting you know
13     it was not the shoulder.  The road came in --
14 Q.  Why don't you draw what you're describing so we
15     have a little bit of an idea.
16 A.  The road came in just a little bit for a car
17     space.  It came in, and I knew it was there.
18     There used to be some kind of stand there.
19 Q.  Could you draw, it's not clear on this piece of
20     paper, where the boundary or if there is a curb
21     in the eastbound so it would be on the
22     right-hand side --
23 A.  A curb?
24         MR. FISCHER:  A curb, like the edge

112

1      of the road.
2  Q.  (By Mr. Silverfine):  Or the end of the road so
3      that I know a second line, a straight line, is
4      where the end of the road is.
5  A.  That's why I drew the shoulder; I'm using this
6      red line.
7  Q.  You're using the red line on the piece of paper
8      as the end line for Route 30?
9  A.  Yes.
10 Q.  Could you put a little rectangle where your car
11     came to a stop?
12 A.  This is where I am.  I put "shoulder" there.  I
13     don't know if that spells shoulder.  This is my
14     auto.  I went into here and not panicking or
15     anything, just wondering what, if anything,
16     happened, pulled over out of the way of
17     traffic.  This is my car stopped here.
18 Q.  Can we put, how about for your last name "LB,"
19     for "Lockhart-Bembery."  Could you put that
20     inside that little triangle as well as where
21     you first began at the top of the page.  Right
22     off the shoulder was where you came to a stop?
23 A.  Stop.
24 Q.  What is beyond where your vehicle stopped?

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

113

```
1   A.  Just more road.
2   Q.  What is off to the right as you're heading
3       eastbound?
4   A.  On this side?
5   Q.  As you're facing eastbound, what is facing off
6       to your right where your vehicle stopped?
7   A.  Nothing.
8   Q.  You say "nothing" --
9   A.  If I went further --
10  Q.  I understand.  What I'm asking you is where you
11      indicated, what is off to your right?
12  A.  Grass and snow.
13  Q.  Is it sloped, it is straight; what is there?
14  A.  No.  It's straight.
15  Q.  Did your car remain there?
16  A.  Yes.
17  Q.  That's where you left the car when you called
18      AAA?
19  A.  I got of the car, yes.
20          MR. FISCHER:  Listen to the question
21      and answer the question.
22  Q.  (By Mr. Silverfine:  Where is it that you
23      first saw Officer Sauro's vehicle pull over?
24          MR. FISCHER:  Objection.
```

114

```
1   Q.  (By Mr. Silverfine:  Did you see
2       Officer Sauro's car pull up, the police
3       officer?
4   A.  Not until I stopped.
5   Q.  That's what I asked you.  Did you understand --
6       there's no tricks here.
7   A.  No.
8           MR. FISCHER:  If I could be helpful,
9       it wasn't clear whether you meant where
10      she was when she saw the vehicle or where
11      the vehicle was.
12  Q.  (By Mr. Silverfine:  You've indicated on this
13      diagram that you came to a stop where you've
14      marked, correct?
15  A.  Yes.
16  Q.  I'm asking you, can you indicate on that when
17      it is that you first saw Officer's Sauro car,
18      his cruiser?
19          MR. FISCHER:  Objection.  You don't
20      mean when, you mean where.
21  Q.  (By Mr. Silverfine:  Where did you first see
22      Officer Sauro's car?
23          MR. FISCHER:  Objection.
24          THE WITNESS:  I still can't answer
```

115

```
1       that.
2   Q.  (By Mr. Silverfine:  Let me ask you this.
3       Eventually, you saw Officer Sauro's car; is
4       that fair to say or not?
5   A.  Not until he was on the radio.  I didn't really
6       pay any attention.
7   Q.  When did you see him in his cruiser on the
8       radio?  Where in relation to where you stopped
9       did you see his cruiser?
10  A.  There is a little street right here.  He was
11      like right about here.
12  Q.  Why don't you draw another rectangle and write
13      "Sauro."  When you saw that cruiser you've now
14      indicated by putting Sergeant Sauro in that
15      box, how far back was he?
16  A.  He was pretty far back.
17  Q.  Approximately how far back?
18  A.  I don't know.
19  Q.  Give us your best estimate?
20  A.  I can't.
21  Q.  You could hear him on the radio from there?
22  A.  Yes.  I couldn't hear what he was saying.
23  Q.  In terms of where you are, where did your car
24      end up in relation to where you stopped the
```

116

```
1       car?
2   A.  Where did it end up?
3   Q.  Where did it end up?
4   A.  I should have drawn it the other way because
5       it's way down here.
6   Q.  How far down off the piece of paper --
7   A.  Really far down here in trees.
8   Q.  Are you having any problem with my questions
9       because I'll be happy --
10  A.  But, I didn't know you were going to ask me
11      that or I would have started the other way.
12  Q.  If it helps you, we'll give you another piece
13      of paper.  That's fine.  I don't want to put
14      any words in your mouth.  Why don't we mark
15      this one as Exhibit 2 --
16  A.  No, no.
17  Q.  Excuse me.  It's my deposition.
18          (Whereupon a Diagram was marked as
19              Exhibit No. 2.)
20  Q.  This is now Exhibit 2.  For the purpose so
21      we're clear on the record, we've been referring
22      to Exhibit 2, the first diagram.  I would like
23      you to sign and date it so it's clear you're
24      the one that authored it.  Just for purposes
```

169
```
 1  A.  No.
 2  Q.  How about prior to February 6, 2002?
 3  A.  We did it on a monthly basis.
 4  Q.  When you say "colleagues," where were these
 5      colleagues?
 6  A.  What?
 7  Q.  Where?
 8  A.  Throughout Framingham, Cambridge, we got
 9      together and treated one another.
10  Q.  Did you see somebody in particular?
11  A.  No.  We all knew one another.
12  Q.  Besides what you've told us, what other
13      economic damage are you claiming as a result of
14      the injuries you suffered on February 6, 2002?
15  A.  I have no idea how to answer that question.
16  Q.  You've told us the extent of your economic
17      damage after February 6, 2002?
18  A.  No.  I haven't told you.
19  Q.  What other economic damages have you
20      suffered --
21  A.  I said I don't have any idea of how to
22      enumerate my financial losses.
23  Q.  Do you have any notes or diaries of the events
24      as you wrote them down, or did you write them
```

170
```
 1      down, as of February 6, 2002?
 2  A.  No.  I don't need them.
 3  Q.  Officer Sauro, was he dressed in uniform that
 4      day?
 5  A.  Yes.
 6  Q.  Do you recall the color of the uniform?
 7  A.  No.
 8  Q.  Do you recall if he was wearing a hat or not?
 9  A.  No.
10  Q.  Have you filed any medical insurance claims
11      relative to this case with anyone?
12  A.  No.
13          MR. SILVERFINE:  I think I'm
14      finished.
15          MR. FISCHER:  In response to your
16      question about the medical claims, there
17      was a PIP claim filed, and there is, I
18      believe, a lien from Mass. Medical for
19      that.
20          MR. SILVERFINE:  Do you know when the
21      PIP claim was filed on your behalf?
22          THE WITNESS:  No, I don't.  The
23      hospital did all that.
24  (Deposition concluded at 4 p.m.)
```



DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

173

1          C E R T I F I C A T E
2
3    COMMONWEALTH OF MASSACHUSETTS
4    BRISTOL, SS.
5
6         I, THERESA M. EDWARDS, a Notary Public in and for
7    the Commonwealth of Massachusetts, duly commissioned,
     qualified and authorized to administer oaths and to
8    take and certify depositions, do hereby certify that
     heretofore, on the date cited above, the witness
9    personally appeared before me at the above location and
     testified in the above-captioned case; that the said
10   witness was by me duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that
11   thereupon and while said witness was under oath, the
     deposition was taken down by me in machine shorthand at
12   the time and place therein named and was reduced to
     typewriting thereafter.
13
         I further certify that the said deposition
14   constitutes a true record of the testimony given by the
     said witness.
15
         I further certify that I am not interested in the
16   event of this action.
17
         IN WITNESS WHEREOF, I have hereunto subscribed my
18   hand this 7th day of March, 2005.
19   _____
20               Theresa M. Edwards
21               Notary Public
22   My Commission Expires:
23   August 16, 2007
24